IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


CADENCE EDUCATION, LLC,

       Plaintiff,

v.                                     Case No.  17-2092-JWB

J. BRANDON VORE, SARAH VORE,
and FHD, INC.,

       Defendants.


## MEMORANDUM AND ORDER

This matter comes before the court on the following motions and briefs:  Defendants' Motion for Summary Judgment (Docs. 154, 155, 177, 183); Plaintiff's Motion for Summary Judgment as to Liability on Count 1 (Docs. 156, 157, 168, 182); Plaintiff's Motion for Summary Judgment on Counterclaims (Docs. 159, 169, 181, 186); Defendants' Motion for Order Regarding Privilege (Docs. 175, 185, 188); Plaintiff's Motion to Strike (Docs. 176, 184, 189); Plaintiff's Motion to Exclude Expert Testimony (Docs. 194, 207, 210); Defendants' Motion to Exclude Expert Testimony (Docs. 196, 208, 211); and Defendants' Second Motion for Sanctions (Docs. 214, 216, 218.)

### I. Background

Brandon and Sarah Vore, through various business entities, operated several early childhood educational facilities, including one called "Small Beginnings" in Overland Park, Kansas.  Small Beginnings leased the building where it operated (the "Master Lease"), at 15801 Metcalf Avenue in Overland Park, Kansas, from Brandon's parents, James and Patricia Vore.[1]

---

[1] James and Patricia Vore were initially named as Defendants but the claims against them were resolved.  (Doc. 42.)

Plaintiff Cadence Education ("Cadence") operates over 150 early childhood educational facilities. In February of 2016, Cadence entered into an Asset Purchase Agreement ("APA") with FHD Holdings, Inc. ("FHD"), Sarah Vore's holding company that owned Small Beginnings, as well as with several other education businesses (the "Sellers") controlled by Brandon and Sarah Vore, pursuant to which Cadence purchased the assets of these businesses. Small Beginnings' lease for 15801 Metcalf Avenue was transferred to Cadence as part of the deal. The lease required monthly rental payments of $36,525.00.

As part of the overall transaction, Cadence and FHD also entered into a sublease ("the Sublease") for part of the Small Beginnings' building. The agreement called for FHD to sublease an 11,500 square-foot "Subleased Premises" for a two-year period, although FHD was not to occupy the Subleased Premises.[2] FHD agreed to pay monthly rent of $18,252.50 to James and Patricia Vore on behalf of Cadence for the sublease period (hereinafter "Sublease Period"). FHD's monthly rental payment was to be reduced on a proportionate basis to the extent Cadence expanded into and occupied portions of the Subleased Premises. James and Patricia Vore, as master lessors of the building, consented to the Sublease.

FHD did not make any monthly rental payments on Cadence's behalf during the Sublease Period. Cadence paid the full monthly rental of $36,252 for that period to James and Patricia Vore.

Cadence filed this action claiming (among other things) breach of contract, unjust enrichment, fraud, and civil conspiracy against Defendants Brandon Vore, Sarah Vore, and FHD. Defendants deny the claims, and further assert counterclaims stemming from Cadence having taken possession of certain computer equipment. Defendants contend Cadence entered a locked

---

[2] The apparent purpose of this unusual arrangement is explained, *infra*, Section II.2.

server room and took the equipment, as well as proprietary data and software, without authority. They assert claims for conversion and trespass.

## II. Uncontroverted facts

1. <u>The Sublease</u>.

Cadence and FHD entered into the Sublease on February 26, 2016. (Doc. 45-4.) All terms of the Sublease are in writing. In introductory clauses, the Sublease acknowledged: the existence of the Master Lease dated September 1, 2012, between James Vore and Small Beginnings; that Small Beginnings' interest in the Master Lease was assigned to Cadence; and that Sublessor (Cadence) and Sublessee (FHD) desired to sublease a portion of the leased premises "which may diminish over time" to FHD, with "such initial portion further described on Exhibit B attached hereto and made a part hereof (the 'Subleased Premises')." Despite this recital, no Exhibit B showing or describing the Subleased Premises was attached to the Sublease.

The Sublease was subject to all terms and conditions of the Master Lease. It provided that Sublessee (FHD) "shall assume the obligation to pay Rent (as described below) and Sublessee's proportionate share of real estate taxes (as described below)." (Doc. 45-4 at 1.) Section Four of the Sublease provided that FHD was to pay rent to James Vore, on behalf of Sublessor Cadence, for the Subleased Premises. This rent was due in advance on the first day of each month of the Sublease term, "without deduction, offset, prior notice, or demand," according to the following schedule: "March 1, 2016 – February ___, 2018      $18,252.50 per month". (Doc. 45-4 at 2.) Section Five of the Sublease provided that "Sublessee [FHD] shall not occupy the Subleased Premises." (*Id.* at 3.)

The Sublease provided that notwithstanding the foregoing, Cadence, upon notice to FHD, "may occupy portions of the Subleased Premises" without terminating the Sublease, "in which case the Rent shall be reduced on a proportionate basis." This provision stated the "initial size of the Subleased Premises is approximately 11,500 square feet," and that "[a]s Sublessor expands into the Subleased Premises, the portion occupied by Sublessor shall be removed from the Subleased Premises and the Rent shall be reduced accordingly." The reduction in rent "shall occur … on the first day of each month based on Sublessor's occupancy of the Subleased Premises for the just completed month." (*Id.*) Once the Sublessor (Cadence) occupied at least 10,000 square feet of the Subleased Premises, the Sublease would "be automatically terminated." (*Id*. at 2.)

Any rent not paid within ten days after the due date "shall bear interest from the due date until paid at eight percent (8%) per annum, and Sublessee shall pay Sublessor a 'late charge' of five cents ($.05) for each dollar due." (*Id*. at 3.)

The Sublease stated that it commenced "on February ___, 2016," and terminated on the earliest of three possible dates: 1) "February ___, 2018," 2) upon 60 days' notice of termination from Cadence, or 3) the date the agreement terminates by its terms or by operation of law. (Doc. 45-4 at 2.) The duration of the Sublease was thus no more than two years.

The agreement provided that if any action were filed in relation to the Sublease, "the unsuccessful party … shall pay to the successful party … a reasonable sum for the successful party's attorney fees." (*Id.* at 5.) The Sublease "shall be governed by, construed, and enforced in accordance with the laws of Kansas." (*Id.*)

2. Circumstances surrounding the Sublease.

In 2015, Cadence and Brandon Vore began negotiating an APA under which Cadence would buy the assets of several existing child care businesses, including Small Beginnings. FHD

Holdings, Inc., which was owned entirely by Sarah Vore, owned the stock of Small Beginnings, Inc.  Brandon negotiated on behalf of all of the Sellers (i.e., the childhood education businesses whose assets were being sold), which were all entities owned or controlled by Brandon and/or Sarah Vore.

Small Beginnings operated in the largest space of the schools acquired in the APA, but it had the lowest "occupancy rate" of those schools, in terms of the number of enrolled students compared to the number of students the building could accommodate.  Its enrollment was only about half of the building capacity.  (Doc. 177 at 10.)

Doug MacKay and John Wilcox (Cadence's outside counsel) negotiated the terms of the Sublease on behalf of Cadence.  In negotiations in May of 2015, MacKay sent Brandon an email with a Letter of Intent concerning the APA.  MacKay expressed concern over an empty space in one of the other facilities and how that could affect the purchase price.  He said that "similarly" with respect to Small Beginnings, "I want to grow the program into the entire facility but I am asking for 24 months to make that happen.  I am suggesting that each time we take over space our rent goes up (proportionately) – the quicker we take over more space the quicker we get to paying full rent.  However at the end of 24 months we start paying full rent regardless of how much space we are using."  (Doc. 177-2 at 3.)

Had the Sublease not been entered, Cadence would have reduced the overall purchase price it was willing to pay under the APA to complete the transaction.  (Doc. 117 at 11.)

Prior to execution of the APA and Sublease, on February 13, 2016, Jim Vore emailed a proposed written agreement to Brandon and Sarah Vore.  Patty Vore was copied on the email.  The proposal called for Brandon and Sarah to make a payment of $1.5 million to Jim and Patty upon closing of the APA with Cadence.  The payment was ostensibly to pay off the balance of a 2012

promissory note owed by FHD to Jim and Patty. In return, Jim and Patty would consent to assignment of the FHD lease to Cadence and would "fully compensate" FHD for its share of the rent and tax payments that FHD would make to Cadence under the Sublease. (Doc. 177-19.) In the email, Jim Vore stated:

> As you will observe in the Agreement, the mechanics of paying a portion of the Lease, taxes, and expenses are not exactly as they may end up being once we see in action what works best. We can discuss this further if needed, but at this point, suffice it to submit that Cadence must view this as Mom & Dad being fully covered under the terms of the Lease. With your addendum, surely you can agree with Cadence to pay us directly, and the purposes of our agreement are fully achieved when you subsequently don't pay the 50% Lease payments to us. However, I believe the best course of action is for you to submit to us copies of expenses paid by you to Cadence so that we can then pay you, as Cadence should not be aware that we are not entitled to payment per the terms of the Lease.

(*Id*. at 5-6.)

Brandon did not sign the proposed agreement. On February 14, 2016, he emailed Patty Vore stating in part that "we're not signing anything dad puts in front of us again." Brandon said he would be back in touch "about the short term lease adjustment once dad undoes the damage he caused by emailing John" [Wilcox], Cadence's representative. Brandon provided a document that only required Patty's signature and which said receipt of $1.5 million from FHD upon the Cadence closing would fully pay off "the purchase agreement."[3] (*Id*. at 15.) Patty Vore signed the document. (*Id.*)

Cadence had third parties inspect the Small Beginnings building prior to February 26, 2016, but the purpose of the inspection was not to measure the building.

---

[3] The "purchase agreement" may have been a reference to an agreement under which FHD acquired the stock of Small Beginnings. (*See* Doc. 147 at 7.)

On February 29, 2016, Jim Vore emailed Brandon the master lessor's consent to the Sublease between Cadence and FHD. He also provided account details for Brandon to wire $1.5 million to Jim and Patty Vore's account.

3. <u>Subleased Premises</u>.

The parties have cited diagrams of the Small Beginnings building. (Doc. 155-4; Doc. 177-9.) The diagrams are useful for understanding the contentions, but as previously indicated no diagram was attached to the Sublease, nor did the Sublease describe the Subleased Premises beyond stating that it was approximately 11,500 square feet. Cadence contends the Sublease's reference to the square footage of the Subleased Premises "was in reference to the non-tuition generating classrooms capable of being licensed for enrolled students." (Doc. 177 at 5.) Defendants contend the Subleased Premises was the "back half" of the building located behind a set of fire doors, which was an approximately 10,400 square-foot area known as "Phase 2" of the construction. (Doc. 168 at 9.)

The parties did not discuss detailed square footage calculations with each other before executing the Sublease. Brandon Vore did not know the total square footage of the building at the time of the Sublease. The total square footage was actually about 20,700, although a Cadence questionnaire completed before closing listed it at 25,000 square feet. (Doc. 177-15 at 14.)[4]

Defendants allege that Cadence sublet particular rooms in the building to FHD. The materials cited in support of those allegations are entirely conclusory. (*See e.g.,* Doc. 155-1) (Brandon Vore declaring that "Cadence sublet room 13 … to FHD.") Cadence declares in equally conclusory terms that Cadence "did not sublease" certain rooms to FHD. To the extent the parties

---

[4] Cadence alleges that "the Vores and FHD represented to Cadence" that the total square footage was 25,000 feet, but the materials cited by Cadence do not show that this representation came from the Vores or FHD. (Doc. 177 at 12-13.) In fact, Cadence has repeatedly asserted facts in the summary judgment briefs that are not supported by the materials cited in support.

agree that particular rooms were included in the Subleased Premises, the court includes those rooms in the statement of uncontroverted facts below. Otherwise, the court disregards conclusory assertions that do not show a proper factual basis for a witness's declaration that particular rooms were, or were not, part of the Subleased Premises.

The parties agree that the Subleased Premises included at least the Minnesota Room (Room 11), the Dakota Room (Room 12), the North America Room (Room 14), the South America Room (Room 15), the Antarctica Room (Room 16), the Vaillancourt Room (Room 17), and the Music Room (Room 18). All of these rooms were located in the back portion of the building. (*See* Doc. 155-4.)

Defendants assert in conclusory fashion that Cadence "used" or "utilized" the entire space in the Small Beginnings building. (*See e.g.*, Doc. 155-7 at 1) ("Throughout my employment at Cadence, all of the space in the building … was utilized for the business purposes of Cadence.") In keeping with summary judgment standards, the court disregards any such statements that fail to describe the alleged use, fail to show the witness's personal knowledge, or fail to show when the alleged usage occurred.

Defendants cite evidence that Cadence never told its employees not to use any of the space in the Small Beginnings building. (Doc. 155-6 at 2.) They also cite testimony that Cadence used some of the rooms in the following manner: Cadence "used the CIP [supply closet] room for art storage"; it "used the second floor office for storage"; it "continued to use Room 10 [Asia] for renovations and then the 2-year old classroom"; it "used Room 14 [North America] for grade school part time"; it "used Room 13 [Branford] for grade school full time"; it "moved pre-K from Room 10 [Asia to Room 15 [South America]" sometime "in the summer of 2016"; in "late summer and Fall 2016" it "moved the preschool only class from Room 7 [Africa] to Room 16 [Antarctica]";

8

and it "used the gymnasium [Room 19] and music room [Room 18]" from February 29, 2016 until late June 2017.  (Doc. 155-6 at 1-2.)

Just prior to execution of the Sublease, FHD was using all of the rooms in the Small Beginnings building in some form or fashion.  None of the rooms were empty.  (Doc. 177-5 at 9.) After execution of the Sublease, Cadence continued to use Rooms 11, 12, 14, 15, 16, 17, and 18, in some manner, including by leaving items in storage that were placed there by FHD and that were acquired in the APA.  Cadence concedes that it used the Dakota Room [Room 12] for storage throughout the Sublease; it used the Minnesota Room [Room 11] for storage during the Sublease; it occupied the Branford Room [Room 13] as an enrolled grade school class (as had FHD) for the period of the Sublease;  it used the North America Room [Room 14] for tutoring (as had FHD) until May 2017, after which it used the room as an enrolled grade school and then a pre-k classroom;  it used the South America Room [Room 15] for storage (as it had been used by FHD) until July 2016, when it was used as an enrolled pre-K classroom instead of the Asia Room [Room 10];  it used the Vaillancourt Room [Room 17] as a staff lounge (as FHD had) throughout the Sublease; it used the Gymnasium [Room 19] as a gym (as FHD had) throughout the Sublease. (Doc. 177 at 5-8.)

About four months into the Sublease, Cadence raised FHD's failure to pay its portion of the rent.  Doug MacKay emailed Brandon and Jim Vore on June 30, 2016, asserting that although the Sublease only made Cadence responsible for fifty percent of the rent, "we have all missed that provision" and Cadence had been paying the full rent.  MacKay calculated that Cadence had overpaid its share by $56,676.73, and asked Brandon and Jim how they wanted to handle it, suggesting either reimbursement or a credit against future rent.  (Doc. 177-20 at 7.)  Brandon responded with an email stating: "I'm sorry you weren't alerted to the overpayments by the

recipient [i.e. Jim]. This is my first notification as well. I don't believe now is the time to renegotiate the contracts. It's my opinion that you should be reimbursed the excess payments by Jim." (*Id.*) Jim Vore responded by asking Cadence to continue paying the full rent "and collect the other half from Brandon that is his responsibility, including any amount to date ($56,676.72) that you have overpaid." (*Id.*)

On July 11, 2016, Jim Vore emailed Doug MacKay, stating he had not received any rent for July and asking MacKay to confirm that Cadence would continue to make full rent payments. (Doc. 177-20 at 3.) MacKay emailed Brandon, asking how he should respond to Jim, noting that "[f]ollowing your instructions we did not pay any rent for July." (*Id.* at 2.) Brandon responded to Doug MacKay that "[a]s your sub lessee, I know I've already paid him [Jim] but now my challenge is to get him to remember. * * * He cashed my large check so he'll have to establish why you would owe my half additionally." Brandon said he was optimistic the family could resolve it and recommended that Cadence apply its "overpayments" against future rent. (*Id.*) The dispute was not resolved, however, and Cadence subsequently paid the full monthly rent for the remainder of the Sublease Period.

4. <u>Counterclaim facts</u>.

The counterclaims concern property allegedly removed by Cadence from a "server room" on the second floor of a building at 6820 West 121st Street, Overland Park, where the Canterbury Preparatory School operated.

On February 26, 2016, Cadence acquired the business assets of the Sellers pursuant to the APA. The Sellers identified in the APA were: Cadence Education, Inc., Canterbury Preparatory School, Inc., Canterbury Academy at Shawnee Crossings, LLC, Canterbury Academy at Prairie

Ridge, LLC, Small Beginnings, Inc., and Canterbury Academy at Briarcliff, LLC. Pursuant to the

APA, Cadence acquired, among other assets of the Sellers:

> all tangible and intangible assets used in, generated by or associated with the Business, including, all . . . equipment, . . . computers, . . . classroom equipment and supplies, contract rights . . . licenses (to the extent assignable), . . . records, computer software (to the extent assignable) and software licenses (to the extent assignable), proprietary information, intellectual property, trade secrets, trademarks, trademark applications and trade names, . . . logos, copyrights, formulas, recipes, goodwill associated with such intellectual property and the Business, drawings and design situated and/or utilized by the Business or the Schools operated by Sellers (the "Assets").

(Doc. 159-1 at 2-3.)[5]

The APA references two other entities by name: Canterbury Staffing, LLC ("Staffing")

and Canterbury Intellectual Property, LLC ("CIP"). The APA states that these two entities "are

each owned by the same principals that own the Sellers" [i.e., Brandon and Sarah Vore], and that

"the assets related to the business of each are excluded from the 'Assets'" being purchased. (Doc.

159-1 at 2.) The APA described the assets being purchased in Section 1.01, and listed assets being

excluded from the sale in Section 1.02, including:

> (g) all assets owned by Staffing and CIP, including, without limitation, the "Infant Manager" software and the "Canterbury Pre-School Assessment Test" software, and related training materials and curriculum (except for existing software versions presently possessed by the Schools) provided to Sellers by Staffing and CIP, respectively….

---

[5] Defendants fail to address the substance of this allegation. Instead, they object to the version of the APA Cadence attached to the motion, pointing out that it is not authenticated by an affidavit, it is unsigned and undated, and it incorrectly states that the closing is to take place on January 15, 2016. (Doc. 181 at 2.) They then argue that any "arguments about the APA or its purported legal effect should be disregarded as unsupported." (Doc. 181 at 23.) The court finds it uncontroverted that the APA executed by the parties thereto contained the above-cited provisions. Defendants have not disputed that assertion, nor have they cited any evidence to suggest it is not true. Although Cadence should have attached the executed version of the APA to its motion, an executed copy of the APA (bearing the apparent signature of "Brandon Vore, President" on behalf of "Canterbury Preparatory, Inc.") was attached to the First Amended Complaint. (Doc. 45-2 at 33.) That copy contains the same provisions cited above. Defendants offer nothing to suggest that a genuine dispute exists concerning execution of the APA or the above-quoted contents. While Defendants may be correct about authentication of the attached document, they still have an obligation to address the substance of the allegation that the APA contained the quoted provisions. *Cf. Orchestrate Hr, Inc. v. Trombetta*, 2016 WL 3179967, *9 (N.D. Tex. June 8, 2016) ("Litigation is not a game; rather, it is a search for the truth and an effort to obtain justice.") (citation omitted).

(*Id.* at 3.)

Section 1.02(g) of the APA was amended prior to closing. The First Amendment to the APA clarified that although "all assets owned by Staffing and CIP" were excluded from the acquisition, "Sellers will cause the current software version of the 'Infant Manager' and the current servers used to operate such software to be assigned to [Cadence]; provided that, Sellers will not be required to provide any support or upgrades with respect to such software." (Doc. 159-2 at 2.) The First Amendment was signed by Brandon Vore on behalf of the Sellers and separately in his capacity as "the representative."

Section 1.02(h) of the APA excludes "any asset described as excluded in Schedule 1.02 of the Disclosure Schedule." No assets were listed on that schedule.

Cogent Investments, Inc. ("Cogent") owns the building where Canterbury Prep operated and where the server room is located. Cogent is a separate legal entity from the Vores. (Doc. 159-3 at 8-9.) Brandon is the President of Cogent. Cadence executed a lease with Cogent effective February 26, 2016, pursuant to which Cadence leased space[6] in the building. Cogent did not have

---

[6] The parties' statements and evidentiary citations concerning the Canterbury Prep building lease typify (unfortunately) their summary judgment methods. The briefs indicate there was a written lease for the property, but neither side has referred to its terms or provided a copy to the court.

Cadence alleges it executed a lease "for the Canterbury Prep Building," and cites an affidavit of a Cadence Vice President who simply says that Cadence "executed a lease … for the building." (Doc. 159-4 at 3.) The affidavit does not discuss whether the lease covered the entire building or some portion thereof. Cadence also cites testimony of Brandon Vore, but the portion cited shows nothing about the scope of the lease, and an uncited portion shows Vore indicated the server room was not leased to anyone. (Doc. 159-5 at 6.) Cadence then states in a footnote that "[a]lthough the evidence overwhelmingly shows Cadence leased both the first and second floor of the Canterbury Prep Building, the Court need not address that issue to decide this motion for summary judgment." (Doc. 159 at 5, n.2.)

Defendants, meanwhile, allege that Cadence "did not lease, license, or have the right of entry to any portion of the second floor of the Canterbury Prep Building." (Doc. 181 at 18.) The evidentiary materials cited by Defendants do not support this allegation. Defendants first cite an interrogatory response that simply repeats the above statement without disclosing the source or basis for the assertion. (*Id.*) (citing supplemental response to Interrogatory No. 7 in Doc. 181-4.) Defendants also cite a March 8, 2017, email chain in which Cadence President Dave Goldberg asked Ed Shoro about the server room. Goldberg said he understood there was a locked room in the building "which contains servers that belong to Brandon, from which he has run Infant Manager, websites, etc." Goldberg said his understanding was "that we do not have access to that room, and that we have not removed any servers or data from that room." Goldberg asked Shoro and Sharon Moran if they could confirm this and provide more detail including what was in the room and, "if we do not have access, who does have access, etc.?" (Doc. 181-5 at 1-2.) In response,

12

a lease with any other person or entity for the Canterbury Prep building, nor did anyone have a sublease, after February 26, 2016.

Canterbury Elementary School was operated by the Vores on the second floor of the Canterbury Prep building. Cadence did not want to purchase that operation in the APA. Brandon wanted out of the child education business after the APA. Brandon and Doug MacKay agreed that Brandon would continue to operate the Elementary School for the remainder of the school year and that Cadence would staff that operation for Brandon. (Doc. 159-6 at 129-30.)

Defendants' conversion claim (Counterclaim 1) is limited to the following property: accounting records, business records, accounting software, Infant Manager software, computer equipment, hardware, and servers. (Doc. 159 at 6.) According to Brandon, his conversion claim focuses on the following computer equipment, hardware, and servers:

| Host Name of Physical Server | Model of Physical Server | IP Address |
|---|---|---|
| CS-DB01 | Dell Workstation T5400 | 192.168.0.50,3,4,40,49,1.50 |
| CS-HOST01 | Gateway DX4200-09 | 192.168.0.2 |
| CS-HOST02 | Dell Dimension 9200 | 192.168.0.5 |
| VMHOSTCPS02 | Gateway DX4200-09 | 192.168.1.245 |

Shoro wrote that all he knew about the servers "is what Brandon told me," and that "[n]o one with Cadence was given access to the locked room," but "I will check with Emily [Lyon, Director of Canterbury Prep] to see if the school has access." (*Id*. at 1.) Although the evidence thus indicates Cadence may have been locked out of the server room at some unspecified point, none of the foregoing shows one way or another whether Cadence had a lease or other legal right to enter the server room, nor does it show whether Canterbury Prep (the business acquired by Cadence) and its personnel had access to the server room. Moreover, Ed Shoro testified in his deposition that "[w]e were told that we would have access to the [server] room if we needed it." (Doc. 181-4 at 8.)

Other than an affidavit from Brandon, Defendants have not produced any documents to show that Brandon has a property interest in these items.[7] (Doc. 159 at 6.)

The CS-DB01 server had been used to operate the static and dynamic websites used by the Schools sold to Cadence.

CS-HOST01 ran the virtual private network ("VPN") used by the Schools. CS-HOST01 and CS-HOST02 housed certain virtual machines. These two servers and VMHOSTCPS02 all ran VMWare. A server matching the description of VMHOSTCPS02 was located in the Canterbury Prep building during an inspection on June 22, 2018. (Doc. 159 at 7; Doc. 159-16 at 3.)

Mike Hill, who provided services related to the computer equipment at Canterbury Prep beginning as early as 2013, testified that a virtual machine hosted on HOST01 or DB01 was associated with the use of Quickbooks. (Doc. 159-19 at 7.) Brandon Vore has produced no documents showing he purchased or had rights to use the accounting software at issue in Counterclaim 1.

The company records at issue in the conversion counterclaim concern the following companies: Canterbury Academy at Shawnee Crossings, Prairie Ridge, Briar Cliff, Canterbury Prep, FHD, Inc., and the Infant Academy. (Doc. 159 at 8.) The first four entities were "Sellers" whose records were acquired by Cadence under the APA. The fifth company, FHD, is a holding company that was formed solely to own the shares of Small Beginnings, Inc., another Seller identified in the APA. (Doc. 159-20 at 4.) FHD had no business and merely collected dividends from Small Beginnings, Inc. Although Brandon Vore asserts a claim for lost records related to FHD, he is not a shareholder of that company. All of the shares in FHD are owned by Sarah Vore.

---

[7] Defendants assert that Cadence has not supported this contention with evidence. But Cadence has pointed to an absence of evidence for an essential element on which Defendants bear the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.")

(*Id.* at 6.) The sixth company, Canterbury Infant Academy, LLC, was shut down after Cadence elected not to acquire its assets.

Infant Manager is a software application that allows caregivers to track infants (e.g., their feeding, naps, medication) and allows parents to give instructions to caregivers and monitor their children throughout the day. Parents could review notes entered by caregivers and view video of their children via a feed from cameras placed over cribs. (Doc. 170-2 at 11.) The original version of Infant Manager was built to run independently on individual touch-screen Windows machines. The Infant Manager software and data contained on the individual Windows touch screens was mirrored onto CS-DB01 by a data feed using SQL Server DB replication. The database replication on CS-DB01 was "meant as a web host with integration into other separate systems like Infant Manager." (*Id.*) As such, CS-DB01 was not a part of the Infant Manager application, but it was used in conjunction with Infant Manager to facilitate visibility to parents and make it easier for the schools to maintain a roster of children.

There were two versions of Infant Manager at the relevant time. One was the original "client-server" version, which was in operation at Canterbury Prep and Briar Cliff at the time of the acquisition. Aaron Bono of Aranya Software Technologies, whose computer company provided services for the Schools prior to the acquisition, helped design the Infant Manager software. In 2015-16, Aranya redesigned the original version of Infant Manager and created a new cloud-based version. Bono testified he still has a copy of the source code used to create the original version, but he did not recommend redeveloping it given the existence of the cloud-based version. The second version of Infant Manager was never run on CS-DB01; it ran in the cloud on servers leased by Brandon and Sarah Vore. (Doc. 159 at 10.)

The First Amendment to the APA gave Cadence a license to use the original version of Infant Manager in use by the schools at the time of the acquisition, and it assigned the virtual server used to operate that application to Cadence. (Doc. 181 at 4.)

Sarah asserts a conversion counterclaim for "the CPAT program as well as CPAT and Infant Manager data and research." CPAT stands for "Canterbury Preschool Assessment Test," which is a web-based application used to evaluate and report on a child's cognitive and physical development. (Doc. 159 at 11.) Aaron Bono has source code from the original developer of CPAT, but the original version was built on older Windows software, and Bono believed it would be a "monstrous task" to get the old version up and running, and that it was a better use of time and money to build a new version from scratch. (Doc. 159-21 at 64-65.) The CPAT data and research consists of tests administered by Canterbury school employees on pre-school students, prior to the acquisition, which was maintained on CS-DB01. No parental permission was given to commercialize any of the data from the CPAT testing. (Doc. 159-22 at 406.) The CPAT data was originally stored on CS-DB01 and backed up on another drive in the server room.

The server CS-DB01 began to fail by early May 2016, causing problems with Infant Manager. Ed Shoro, Cadence's Director of Information Technology purchased a new server, named CS-DB02, to replace it. Shoro directed Mike Hill of Micronet to get Infant Manager up and running. Hill went in the server room and took multiple drives that were originally in CS-DB01 and placed them in CS-DB02. Hill migrated the software and data stored on CS-DB01 to CS-DB02 on or around May 17, 2016. Hill's work was performed on behalf of and paid for by Cadence. Hill informed Ed Shoro in advance that he would be migrating the software and data stored on CS-DB01 to CS-DB02. Shoro did not object. Brandon and Sarah Vore did not authorize Mike Hill to take any of their data off of CS-DB01. Hill and others acting on Cadence's behalf

usually gained access to the server room from whoever was at the front desk of the building, where a key to the room was kept. (Doc. 159-19 at 20.) After Hill worked on CS-DB02, he turned the matter over to Aaron Bono, who was knowledgeable about Infant Manager. Bono anticipated difficulties in getting the server-based version running, and he informed Cadence that it would bear the expense of doing so. At that point, Cadence and Brandon Vore agreed that Cadence could use a cloud-based version of Infant Manager for the remainder of the school year. (Doc. 159 at 13.)

Ed Shoro directed Mike Hill to remove Brandon as an authorized person with respect to CS-HOST01. Shoro accessed the server room and removed CS-DB02. He did not return any of the hard drives that had been removed from CS-DB01. He shipped CS-DB02 to California. Shoro testified that he opened up CS-DB02 and that it had only one drive in it. Shoro testified that he "wiped" [i.e., erased the contents of] CS-DB02 in California. (Doc. 181 at 20.) Cadence subsequently admitted, however, that there was a second hard drive in CS-DB02. (*See* Doc. 191 at 2.) Defendants now cite evidence that a third hard drive was removed from CS-DB02.[8]

Brandon submitted a declaration stating, "I am the owner" of the servers named CS-DB01, CS-HOST01, CS-HOST02, and VMHOSTCPS02, and "Cadence did not purchase any of" those servers. (Doc. 181-1 at 1.)

---

[8] Cadence was sanctioned by Judge James for its failure to adequately inspect CS-DB02 in the first instance, and for its later failure to promptly disclose its discovery of a second hard drive within CS-DB02. (Doc. 191 at 3; Doc. 215.) As part of that sanction, Judge James ordered Cadence to pay to have CS-DB02 transported to Kansas City for an examination. Defendants have now filed a second motion for sanctions, asserting that its expert discovered evidence that a third hard drive was removed from CS-DB02 sometime after June 4, 2017. (Doc. 214 at 1.) Cadence contends the second hard drive was missed during initial visual inspections because the drive was located in a metal cage that obstructed visibility. (Doc. 216-4 at 3.) Cadence also contends Defendants' expert report filed October 30, 2018, was the first document to provide a serial number for the hard drives from CS-DB02, and that based on this new serial number information, Cadence conducted an additional search and located the third hard drive "in a stack of hard drives in [Ed Soto's] home office space." (Doc. 216 at 7.)

Brandon also declared that "[a]s President of Cogent Investments, Inc., I permitted myself to personally use the locked room on the second floor of the Canterbury Prep Building for storage of my personal effects," including the servers noted above. (*Id.*)

Defendants similarly declare that the Vores are the owners of the Infant Manager software and data, and that Sarah "is the owner of CPAT and the underlying data and research." (Doc. 181 at 16.)

### III. Defendants' Motion for Summary Judgment (Docs. 154, 155, 177, 183).

1. <u>Breach of contract</u>. Defendants first argue FHD did not breach the Sublease because Cadence "immediately expanded into and occupied all of the 'Sublease Premises'" such that FHD's rent obligation "proportionately reduced to nothing for the entire term and/or the Sublease automatically terminated." (Doc. 155 at 6-7.) Defendants argue the Subleased Premises "was the back half of the building beyond the fire doors, or rooms 11-19 and a supply closet," and "[t]here is no genuine dispute that Cadence immediately expanded into and occupied" all of that area. (*Id.* at 8.)

In Kansas, the primary rule in interpreting written contracts is to ascertain the intent of the parties. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250, 264 (2013) (citations omitted). If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. *Id.* If, on the other hand, the language is ambiguous, extrinsic or parol evidence may be considered to construe it. *Id.* The question of whether the language is ambiguous is one of law for the court. *Id.* at 964. When resort to rules of construction is required, the law favors reasonable interpretations

and disfavors constructions that lead to absurd results. *See id.* at 963 ("The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.") (citation omitted). The interpretation of one provision should not be reached by isolating the provision, but by considering the entire "four corners" of the instrument. If the language of the contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary judgment is inappropriate, and the parties' intent becomes a question of fact for a jury to determine. *Id.*. at 964. *See also Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 534 (10th Cir. 2016) (interpretation of ambiguous contract was for the trier of fact).

The relevant Sublease language provides that FHD will pay rent for the "Subleased Premises," that its rent obligation will be reduced on a proportionate basis as Cadence "expands into the Subleased Premises," and that the amount of the reduction will be "based on [Cadence's] occupancy of the Subleased Premises for the just completed month." The court finds that these provisions are ambiguous. First and foremost, the provisions are susceptible to multiple constructions because the Subleased Premises was not defined by the Sublease. It was only described as an area of "approximately 11,500 square feet." Defendants argue it referred to the back half of the building beyond a set of fire doors. (Doc. 155 at 8.) That may be a reasonable understanding in view of the layout and size of the building, but it is not one mandated by the contract language. For its part, Cadence suggests the parties understood the Subleased Premises to be the "non-tuition generating classrooms capable of being licensed for enrolled students." (Doc. 177 at 5.) That may also be a reasonable understanding. Cadence was purchasing the assets of an established business, and the parties may well have contemplated that Cadence would start out operating in the same manner – and using the same rooms - as FHD, and that Cadence would

need to get licensing for additional classrooms in the future as its enrollment increased. But again, the language of the Sublease does not show this was necessarily the parties' understanding.[9]

The parties agree that a number of particular rooms formed part of the Subleased Premises. But even to the extent they agree on that point, the Sublease provisions are ambiguous because Cadence's "expand[ing] into" and "occupancy" of those areas was the key to a rent reduction, but it is not clear what the parties meant by these terms. "Occupancy" can refer simply to possession of and intent to use something. *See* II Bouvier Law Dictionary 1884 (S.M. Sheppard ed. 2012) (defining occupancy as "[t]he taking possession of those things corporeal which are without an owner, with an intention of appropriating them to one's own use.") But what use by Cadence constituted occupancy? The parties obviously understood that Cadence would be the only tenant in possession of the entire building during the Sublease Period and would have control of and access to the entire building. Some areas of the Subleased Premises had apparently been used previously by FHD for storage, for a lounge, for tutoring, as hallways, or for other purposes. It is doubtful that the parties intended such uses, if merely continued in the same manner by Cadence, to amount to "expand[ing] into" and "occupancy" of the Subleased Premises. The term "occupancy" could take meaning from the particular trade or business – for example, in the hotel business it refers to a percentage of available rooms that are rented. *See In re TIAT Corp.*, No. 16-10764, 2017 WL 161675, *3 (Bankr. D. Kan. Jan. 13, 2017). Cadence suggests that in the business of early childhood education centers, "occupancy" similarly refers to the use of rooms as licensed

---

[9] During negotiations, the parties apparently discussed how use of the space might impact licensing, but the import of the discussion is unclear from the record. *See* Doc. 177-14 at 3 (Email from Sarah Vore to Shelly King of Cadence) (Sarah Vore asking to include Mandy [the current Director of Small Beginnings] in a meeting where paperwork for Kansas relicensing application will be discussed; noting Mandy is "critical to continuing the enrollment growth at Small Beginnings"; need her for "relicensing process"; she will have valuable input "about how to best configure the program within the building" which will be wasted without consulting her as we create the new application because "[i]t would probably amount to an additional relicensing process if you tried to optimize the space after having already relicensed without her input.")

classrooms. That is not an unreasonable construction, but Cadence fails to cite evidence showing this is such a well-established term of the trade that the parties must have used it in that sense.

If a contract is ambiguous, "the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties." *Akandas, Inc. v. Klippel*, 250 Kan. 458, 476, 827 P.2d 37 (1992). Prior to the APA, FHD used all of the rooms in the Small Beginnings building (including the Subleased Premises) for one purpose or another, including for storage. It would be entirely reasonable to infer that the parties considered FHD's usage to be a baseline, such that Cadence's "expand[ing]" into the Subleased Premises, and its "occupancy" of that area, was intended to require some usage more extensive than FHD's. Under that view, the fact that Cadence may have left assets acquired under the APA in rooms where FHD had stored them could not reasonably be considered "occupancy" of those rooms. But beyond that, whether the parties intended "occupancy" to mean Cadence's use of rooms as tuition-generating licensed classrooms for new enrollees (as Cadence argues), or to mean Cadence's use for other education-related purpose (as Defendants argue), is simply not answered by the materials cited. The potentially conflicting meaning of these terms, under the circumstances of the transaction between the parties, renders the contract ambiguous. *See Weber v. Tillman*, 259 Kan. 457, 476, 913 P.2d 84, 96 (1996) (citation omitted) (to be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language); *Central Nat. Res., Inc. v. Davis Operating Co.*, 288 Kan. 234, 245, 201 P.3d 680 (2009) (an instrument is ambiguous when the application of pertinent rules of construction fails to make certain which one of two or more meanings is conveyed by the words employed by the parties.)

As the Kansas Supreme Court made clear, "if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary judgment is inappropriate." *Waste Connections*, 296 Kan. at 964. Under the uncontroverted facts, FHD is not entitled to summary judgment on Cadence's breach of contract claim.

2. <u>Breach of the duty of good faith</u>. Defendants argue FHD did not breach a duty of good faith under the Sublease because Cadence immediately expanded into and occupied the Subleased Premises, thereby terminating the Sublease. (Doc. 155 at 10.) The court rejects that argument essentially for the same reasons discussed above. The record shows genuine issues of fact to whether Cadence expanded into and had "occupancy" of the entire Subleased Premises.

Nevertheless the court agrees with FHD that Cadence has failed to point to evidence that FHD's conduct breached an implied duty of good faith. "Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties…. [T]here is an implied undertaking in every contract on the part of each party that [it] will not intentionally and purposely do anything … which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Trear v. Chamberlain*, 308 Kan. 932, 942, 425 P.3d 297 (2018) (citations omitted.) Cadence's allegations of a breach of the duty of good faith are premised solely on FHD's failure to pay the rent required by the Sublease. (Doc. 147 at 17.) The duty to pay rent, however, was an express term of the agreement. When an express covenant addresses the obligation underlying the alleged breach of contract, there is no need to resort to implied covenants. If Cadence's evidence persuades the jury that FHD failed to pay the required rent, that would constitute a breach of the express terms of the agreement. But that fact alone does not also show that FHD breached the implied covenant of good faith and fair dealing.

Cadence fails to identify acts beyond the alleged failure to pay rent showing that FHD otherwise harmed or interfered with Cadence's right to receive the benefits of the Sublease. *Schneider v. CitiMortgage, Inc.*, No. 13-4094-SAC, 2018 WL 4491244, at *11 (D. Kan. Sept. 19, 2018) (plaintiffs failed to state claim where they restated an express contractual duty without alleging any conduct that technically complied with that duty but denied them the intended fruit thereof). Accordingly, Defendants' motion for summary judgment will be granted with respect to the alleged breach of the implied duty of good faith and fair dealing.

3. <u>Fraud or fraudulent inducement</u>. Cadence claims FHD and/or Brandon Vore are liable for fraud because Brandon knowingly made false or misleading statements or omissions to Cadence, including statements or omissions as to the amount of rent owed to the master lessor and as to FHD's intention to pay the rent and other costs contemplated by the Sublease. (Doc. 147 at 18.) Defendants seek summary judgment by arguing there is no evidence "that any specific person uttered any specific statement or omitted any specific material information," or because Cadence fails to show justifiable reliance on any such statements. (Doc. 155 at 12-13.)

In Kansas, a party claiming fraud must prove the following essential elements: (1) That false or untrue representations were made as a statement of existing and material fact; (2) that the representations were known to be false or untrue by the party making them, or were recklessly made without knowledge concerning them; (3) that the representations were intentionally made for the purpose of inducing another party to act upon them; (4) that the other party reasonably relied and acted upon the representations made; and (5) that the other party sustained damages by relying upon them. *See Alires v. McGeehee*, 277 Kan. 398, Syl. ¶3, 85 P.3d 1191 (2004); Pattern Instructions of Kansas (PIK) § 127.40. A similar claim lies for a fraudulent promise pertaining to future events, which occurs when a person makes representations as to what he will be do in the

future but has no real intention to do the thing represented. *See Olsburg State Bank v. Anderson*, 154 Kan. 511, 517-18, 119 P.2d 515 (1941); Pattern Instructions of Kansas (PIK) § 127.42.

Fraud is never presumed and must be shown by clear and convincing evidence. *Alires v. McGehee*, 277 Kan. 398, Syl. ¶ 1, 85 P.3d 1191 (2004). Cadence fails to cite clear and convincing evidence of fraud. Cadence claims Brandon represented that the amount of rent due under the Master Lease was $36,525, which "was not true because … the Master Landlord had actually agreed to accept only $18,252.50 in rent…." (Doc. 177 at 25.) It also claims Brandon falsely represented that FHD "would split rent 50/50 with Cadence," which was false because Brandon had allegedly agreed with James Vore that "any sums paid by FHD would be returned to FHD…." (*Id.*) In support of these claims, Cadence cites evidence of statements by Brandon and his attorney, both of which indicate that Brandon believed he had prepaid FHD's share of the Sublease rent to James Vore as part of a $1.5 million payment. *See* Doc. 177-19 at 3 ("the 1.5 million was always intended to be a payment of 1.1 million for the school and a $400,000 advance payment of two years rent to satisfy the sublease"). Even if a jury were to find that such an agreement between FHD and James Vore existed, Cadence has failed to cite evidence of fraudulent intent or knowledge on Brandon's part. Rather, the cited evidence suggests nothing more than that Brandon attempted to discharge FHD's obligation under the Sublease to pay monthly rent by making a large, lump-sum payment to James Vore. There is nothing inherently nefarious about such an agreement. Cadence fails to explain how a prepayment of FHD's Sublease rent, assuming that is what occurred, rendered Brandon's representations untrue or material as to Cadence, which would have obtained the benefit of its bargain from a prepayment of Sublease rent by FHD. Cadence claims, without citing evidence, that the arrangement between Brandon and James was done "so that Cadence could be made to pay … the original amount of the rent of $36,525.00." (Doc. 177

at 25.)  Cadence cites no evidence to show that Brandon made the challenged representations for the purpose of causing Cadence to pay the full $36,525 in rent.  If in fact Brandon prepaid FHD's rent, the fact that James Vore refused to credit FHD for the payment might show a breach of the Master Lease on the part of James, but it would not show that Brandon acted with fraudulent intent. In sum, Cadence's evidence on this point falls woefully short of the clear and convincing evidence required to prove fraud.  Defendants' motion for summary judgment is granted with respect to the claim of fraud.

4.  <u>Reformation of contract and breach of reformed contract</u>.  Cadence claims the parties made a mutual mistake with respect to the details of the square footage and rent-reduction formula in the Sublease because neither party intended Cadence's rent to increase until it expanded with additional enrolled students.  In the alternative, it argues that it made a unilateral mistake as to the formula and square footage after FHD engaged in inequitable or fraudulent conduct.  (Doc. 147 at 20.)  Defendants argue that Cadence's claims for reformation of the Sublease and for breach thereof fail because Cadence has "no evidence of any mutual mistake, and has no evidence of a false statement or concealment or any justifiable reliance."  (Doc. 155 at 16.)

"Contract reformation is an equitable remedy available to correct mutual mistakes of fact or fraud."  *Liggatt v. Employers Mut. Cas. Co.*, 273 Kan. 915, 926, 46 P.3d 1120 (2002). Additionally, "Kansas cases have long adhered to the principle that an instrument may be reformed where there is ignorance or mistake on one side and fraud or inequitable conduct on the other." *Andres v. Claassen,* 238 Kan. 732, 740, 714 P.2d 963 (1986).

The uncontroverted facts show that the Sublease was supposed to have a map attached to it showing the Subleased Premises.  Neither party to the agreement, however, attached such a map. These circumstances could conceivably support a claim of mutual mistake, although the evidence

on that point is far from clear. The court notes that contract reformation is an equitable remedy for the court, rather than a jury, to determine. *See Mid-Continent Investments of Kansas, Inc. v. Settle,* 102 P.3d 1 (Table), 2004 WL 2928510, *4-5 (Ks. Ct. App. Dec. 17, 2004). Accordingly, the court will assess the claim for reformation after hearing the evidence at trial. On that basis the court will deny Defendants' motion for summary judgment concerning the reformation counts.

5. <u>Unjust enrichment</u>. Cadence asserts a claim of unjust enrichment against the Vores, arguing that its alleged overpayment of rent and taxes conferred benefits upon these Defendants "as principals and/or representative of FHD." (Doc. 147 at 18.) Defendants argue in part that the Vores are not personally liable for any indebtedness of the corporate entity FHD, which was the party to the Sublease. In response, Cadence asserts that "FHD is merely the alter ego of the Vores; its debts and benefits flow directly to the Vores." (Doc. 177 at 23). In support of that assertion, Cadence cites only a deposition response of an FHD representative who could not say where the proceeds from the APA were deposited. (*Id.* at 23-24.)

In Kansas, the doctrine of alter ego "fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 797, 473 P.2d 33 (1970.) The Kansas Supreme Court has identified a number of factors to be considered in determining whether "the corporate veil should be pierced," including evidence of undercapitalization of the corporation, failure to observe corporate formalities, nonpayment of dividends, siphoning off funds by the stockholder, nonfunctioning of other officers, absence of corporate records, the use of the corporation as a façade for operations of the stockholder, and use of the corporate entity in promoting injustice or fraud. *State ex rel. Graeber v. Marion Cty. Landfill, Inc.*, 276 Kan. 328,

355, 76 P.3d 1000 (2003). The court concludes that the evidence cited by Cadence – a single instance of a representative not knowing where corporate funds were deposited – falls far short of the showing necessary to disregard the corporate form and hold individual stockholders liable. Accordingly, Defendants' motion for summary judgment is granted with respect to Cadence's claim for unjust enrichment.

6. <u>Civil conspiracy</u>. Cadence asserts a claim for civil conspiracy against the Vores for agreeing "to act in concert with each other and/or James Vore to fraudulently induce Cadence into one or more transactions, to overcharge Cadence, to unjustly enrich themselves or to otherwise improperly receive and retain money or benefits, and/or to tortiously interfere with the Sublease between FHD and Cadence." (Doc. 147 at 19.) Defendants contend they are entitled to summary judgment because "Cadence has no evidence of a false statement or concealment or any justifiable reliance," because there is no tortious interference claim left in the lawsuit, and because "overcharging" Cadence or "unjustly enrich[ing] themselves" is not an independent tortious cause of action. (Doc. 155 at 19-20.)

In Kansas, "[t]he elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or cause of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Stoldt v. City of Toronto*, 234 Kan. 957, 957, Syl. ¶5, 678 P.2d 153, 156 (1984) (citing *Citizens State Bank v. Gilmore,* 226 Kan. 662, 603 P.2d 605 (1979)). Such an action must be supported by one or more overt acts which produce an unlawful result. *Id*., 234 Kan. at 957, Syl. ¶6.

Cadence has failed to cite evidence showing the elements of conspiracy. This claim is essentially premised on the same allegations of fraud discussed previously pertaining to the payment arrangement between Brandon and James Vore. (Doc. 177 at 27-28.) But as the court

noted above, evidence that Brandon believed he was prepaying the Sublease rent to James would not constitute evidence of fraud, nor would it show a meeting of the minds between Brandon and James to affect an unlawful objective. Cadence cites no other evidence to support a civil conspiracy claim. It cites no evidence at all with respect to Sarah Vore, except to suggest that she was part of a conspiracy because the Vores "are all family." (*Id.* at 27.) Accordingly, Defendants' motion for summary judgment is granted with respect to the conspiracy claim.

**IV. Plaintiff's Motion for Summary Judgment (Docs. 156, 157, 168, 182.)**

Cadence argues the uncontroverted facts show that FHD breached the Sublease by failing to make the first monthly rental payment due under the Sublease on March 1, 2016. Cadence notes that under the rent-reduction clause, FHD was obligated to pay monthly rent based on Cadence's "occupancy of the Subleased Premises for the just completed month." It argues Defendants have asserted that Cadence expanded into and occupied the entire Subleased Premises "since March 1, 2016," and have thereby conceded that Cadence did not fully occupy the Subleased Premises the day before, on February 29, 2016, thus making FHD liable for its portion of the rent on March 1.

Cadence's motion is premised on the following contention by Defendants in the Pretrial Order:

> The entire Sublease which is the subject of Plaintiff's claims has been terminated since March 1, 2016, and Cadence has no damage, because Cadence has been occupying all of the subleased space since March 1, 2016 and Cadence materially breached the Sublease by failing timely to provide notice of its occupancy of a portion of all of the subleased space to FHD.

(Doc. 147 at 8.)

Cadence's argument for partial summary judgment fails because Defendants' contention that Cadence fully occupied the Subleased Premises "since March 1, 2016," does not constitute an admission that Cadence did not fully occupy the premises the day before. Defendants' contention could have been more precise (by recognizing that Cadence's first day of operations was February

28

29), but a fair construction of the contention does not disclose an intent to admit that Cadence did not fully occupy the Subleases Premises on February 29, nor does it indicate an intent to forego any such contention. Cadence's characterization of this as a "binding admission" that "Cadence did not occupy at least 10,000 square feet of the Subleased Premises until March 1, 2016" places more weight on the contention than it will bear. Accordingly, Cadence's motion for summary judgment is denied.

**V. Plaintiff's Motion for Summary Judgment on Counterclaims (Doc. 158, 159, 181, 186.)**

Brandon Vore asserts a counterclaim for conversion, alleging that Cadence removed, converted, and destroyed accounting records, business records, accounting software, Infant Manager software, computer equipment, hardware, and servers from the server room of the Canterbury Prep building. Sarah Vore asserts a similar counterclaim for conversion of the CPAT program and CPAT and Infant Manager data and research. Brandon also asserts a counterclaim alleging that Cadence's entry into the server room constituted trespass. (Doc. 147 at 23-24.)

Conversion. Cadence first argues the conversion claims fail because the Vores cannot establish a right of title to or possession of the disputed property. Cadence argues the APA conveyed to Cadence all tangible and intangible assets used in, generated by, or associated with the businesses acquired, and that this included the property in dispute except for the CPAT program and the cloud-based version of Infant Manager. (Doc. 159 at 15.) As to the latter two programs, Cadence argues the Vores have no standing to claim conversion of these materials because the assets belonged to CIP and/or Staffing, not to the Vores individually. (*Id.* at 17.) Finally, it contends the conversion claims fail because the Vores cannot show that Cadence took the property with the intent to use or dispose of it.

Conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016 (citation omitted.) To maintain a claim, the plaintiff must have an interest in the thing converted. 18 Am. Jur.2d, Conversion § 68 (West 2004). "It is necessary that the plaintiff be the owner of the property claimed to be converted or that he or she be in possession or entitled to possession at the time of the alleged conversion." *Id. See also Rezac Livestock Comm. Co., Inc. v. Pinnacle Bank,* 255 F. Supp. 3d 1150, 1172 (D. Kan. 2017) (citing *Guernsey v. Fulmer,* 66 Kan. 767, 71 P. 578, 578 (1903) ("[O]n an action for conversion, the petition must allege that at the time of the conversion the plaintiff was either in possession, or had a right to the possession, of the property converted."))

In their response, Defendants first argue the motion as to conversion should be denied because "Brandon and Sarah Vore owned the property at issue" and because Cadence "fails to produce affirmative evidence negating Brandon and Sarah Vore's ownership." (Doc. 181 at 23.) The evidence of ownership cited by Defendants, however, is entirely conclusory. For example, Brandon Vore has submitted a declaration stating simply, "I am the owner" of the property. Such declarations are insufficient to prove ownership under the facts of this case.

The uncontroverted facts show that Brandon, by executing the APA, represented that the Sellers were conveying title to Cadence of essentially all of the Sellers' business assets. The Sellers agreed (with certain exceptions) at closing they would "sell, transfer, assign and deliver … the following assets owned by the Sellers…: all tangible and intangible assets used in, generated by or associated with the Business," including (among other things) computers, contract rights, licenses, records, computer software, software licenses, and proprietary information "situated and/or utilized by the Business or the Schools operated by Sellers…." The uncontroverted facts

show that the property identified by Defendants (leaving aside for the moment the CPAT materials and any cloud-based Infant Manager materials) was situated in, used in, and associated with the Sellers' businesses. The only fair reading of the APA is that it represented that the assets located in and used in the Sellers' businesses were, except for items specifically exempted, being transferred to Cadence. Defendants now claim personal ownership of some of that property, backed only by a conclusory affidavit that does not explain how and with what funds the assets were acquired, whether the property was expensed personally or to a business entity, how the assets came to be located and used in the Sellers' businesses, and what evidence shows the items remained individual property despite their use in the Sellers' business. In such circumstances, no inference of personal ownership can arise from mere possession of the property, because the property was located in and used by the business entities that were selling their assets to Cadence, and Brandon Vore was an officer of those entities. *Cf.* 18 Am. Jur.2d, Conversion § 95 ("To recover in a conversion action, ordinarily the plaintiff must show either title or the right of possession, since title is generally presumed to follow possession.") Defendants cite no other evidence to establish that this property was personally owned as opposed to being owned by the business entities that sold their assets to Cadence in the APA. In sum, Defendants have failed to cite evidence showing a lawful right of ownership or possession of the property sufficient to sustain a claim for conversion.

The court reaches a similar conclusion with respect to Sarah Vore's counterclaim for conversion of the CPAT program and Infant Manager data and research. Defendants cite only conclusory statements that Sarah personally owned this property.[10] But in the APA, signed by

---

[10] Defendants cite two supplemental responses to interrogatories, both of which refer generically to unspecified "documents" and "testimony" of Mike Hill and Aaron Bono. (Doc. 181-2 at 2, 8.) They also cite a portion of Bono's deposition testimony in which he quotes Brandon Vore as saying he plans to rewrite Infant Manager, sell it, and maintain it after the APA, although he says nothing about ownership of the software. (Doc. 181-3 at 4.) Defendants

Brandon, it was represented that the CPAT software (and related materials) and the Infant Manager software were assets owned by Staffing and CIP, two entities that were "owned by the same principals that own the Sellers." In the face of that representation, a conclusory assertion that Sarah personally owned this property is not a sufficient basis for a jury to reasonably find that Sarah Vore, and not Staffing or CIP, owned the property.

Defendants argue that Cadence has failed "to produce affirmative evidence negating Brandon Vore or Sarah Vore's ownership." (Doc. 181 at 23.) But as noted previously, the movant satisfies its burden at the summary judgment stage by pointing to an absence of evidence to support an element on which the non-moving party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 325. Defendants have the burden at trial to establish their personal ownership or right to possession of the property allegedly converted. They have failed to cite evidence from which a jury could reasonably conclude that they, and not their business entities, owned the disputed property. Cadence is accordingly entitled to summary judgment on Brandon and Sarah Vore's counterclaims for conversion.

<u>Trespass</u>. Brandon Vore asserts a counterclaim for trespass, alleging that Cadence "entered onto the premises of Brandon Vore [the server room at the Canterbury Prep building] without any right, lawful authority, or any express or implied invitation of license." (Doc. 147 at 24.) In support of the allegation of possession, Vore cites his declaration testimony that, "[a]s President

---

also cite Sarah Vore's testimony that she "absolutely" personally owns the Infant Manager and CPAT software. Not only is that testimony conclusory, but Defendants do not mention portions of Sarah's testimony indicating a lack of knowledge about ownership. (*See e.g.,* Doc. 181-6 at 8) (these "would be Brandon questions" because "[h]e understands more about the structure between software and CIP and us as individuals than I do.") (*See also id*. at 9 ("Do I own the software personally, or does a company own the software but then license my intellectual property to use that software? I would probably have to consult with my attorney to figure out where that nuance so [sic] that I could answer correctly. I don't know.")

of Cogent Investments, Inc., [he] permitted himself to personally use the locked room … for storage of his personal effects," including the servers in dispute. (Doc. 181 at 18.)

Cadence contends that Brandon Vore did not own or have a superior right to the premises at issue and that, in any event, Cadence had a license or consent to enter the server room. (Doc. 159 at 20.) In response, Defendants argue that Brandon "possessed the space in the locked room on the second floor under claims and color of title," and that Cadence fails to produce evidence negating that fact. (Doc. 181 at 28.)

A trespass occurs when a person enters or remains on premises in the possession of another without the possessor's express or implied consent, any right, or lawful authority. Pattern Instructions of Kansas (PIK) § 126.21; *Frazee v. St. Louis-San Francisco Ry. Co.*, 219 Kan. 661, 663-64, 549 P.2d 561 (1976). The uncontroverted facts show that Cogent, Inc., an entity legally separate from Brandon, owned the Canterbury Prep premises where the server room was located. It is also uncontroverted that Cogent granted a lease to Cadence pertaining to the Canterbury Prep building and did not grant a lease to any other person. Finally, Brandon asserts that, as President of Cogent, he granted himself permission to store personal items in the server room. Even viewed in a light most favorable to Defendants, however, these facts fail to show that Brandon had a right to exclusive possession of, and the right to exclude others from, the server room. Defendants have failed to cite any competent evidence – such as the written lease agreement – to show that Cadence's leasehold interest did not include the server room. Defendants merely cite Brandon's affidavit that he granted himself permission to store some personal items in the room. That is not a possessory interest of the room itself and does not support a claim for trespass against Cadence for entering the room. *See* Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 52 (2d ed.) ("[T]he owner of an easement, who has no possessory interest in the land but only a

right to its use, has no claim for trespass interfering with possession.") *Cf.* Restatement(Second) of the Law of Torts, § 157, comment a ("By 'occupancy' is meant such acts done upon the land as manifest a claim of exclusive control of the land, and indicate to the public that he who has done them has appropriated it.") Because Defendants have failed to cite evidence that Brandon possessed the server room, his claim for trespass fails as a matter of law. In view of that finding, the court need not address whether Cadence had a privilege to enter the server room to obtain or service items acquired in the APA. *Cf.* Restatement(Second) of the Law of Torts, § 181 (except as otherwise agreed, one to whom a possessor of land has transferred a thing on the land is privileged, within a reasonable time and manner, to be on the land to take possession of the thing and remove it.) Cadence's motion for summary judgment is accordingly granted with respect to the counterclaim for trespass.

## VI. Defendants' Motion for Order Regarding Privilege (Docs. 175, 185, 188); Plaintiff's Motion to Strike (Docs. 176, 184, 189.)

The court will address these matters together as they are related. In Doc. 175, Defendants seek an order declaring that a document previously produced by Cadence is not protected by attorney-client or work-product privilege. The document is identified as CADENCE0000201, and has been reviewed in camera by the court. In Doc. 176, Cadence moves to strike the affidavit of a former employee, Amanda Baumgartner, which was submitted by Defendants in support of their motion for summary judgment. (*See* Doc. 155-6.) Cadence argues the affidavit "incorporates or otherwise refers to attorney-client privileged communications and work product prepared in anticipation of litigation." (Doc. 176 at 1.) Cadence complains that the affidavit refers to

discussions with Cadence executives "concerning the uses of the space at the Small Beginnings locations prior to February 13, 2017;" describes visits and observations by those executives; refers to a communication whereby "a Cadence executive asked for a map of the facility showing the parts Cadence was using;" discusses the preparation of a map by Ms. Baumgartner showing all of the building and the related uses by Cadence; refers to the submission of an email by Ms. Baumgartner to Cadence with a description of the uses by Cadence; and "additional communications from counsel for Cadence concerning the litigation after March 2018…." (*Id.* at 5.) Cadence says it "has gathered and will submit for in camera review several communications that clearly show that the discussions at issue were privileged, and that Ms. Baumgartner herself had direct contact with counsel about the very issues that form the subject of her affidavit." (*Id.*) The court has no record of receiving such documents. Moreover, the court finds this motion is largely misguided, as the bulk of the affidavit merely recounts factual matters observed by the witness while she was employed at Small Beginnings – specifically, how Cadence used the rooms in the building. No privilege prohibits the witness from recounting these matters in an affidavit.

The attorney-client privilege provides: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at the client's instance permanently protected (7) from disclosure by the client or by the legal advisor, (8) except if the protection is waived. *Rittgers v. Hale*, No. 17-4019-SAC-KGG, 2018 WL 338218, at *3–4 (D. Kan. Jan. 9, 2018) (citing *In re Syngenta Ag Mir 162 Corn Litigation*, No. 14-2591-JWL, 2017 WL 386835, at *4 (D. Kan. Jan. 27, 2017)). As for the work-product doctrine, it protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). The doctrine "shelters the mental processes of the

attorney, providing a privileged area within which he can analyze and prepare his client's case." *Rittgers*, 2018 WL 338218, at *4 (citations omitted.)

The court will start with the obvious: the attorney-client privilege protects disclosure of substantive communications between attorney and client; it does not protect against disclosure of the underlying facts within the communication. *Rittgers*, 2018 WL 338218, at *4 (citation omitted.) The same is true for the work product privilege. *Id.* Thus, *the facts* gathered in Cadence's investigation are not protected from disclosure even if the investigation occurred at the direction of counsel and in anticipation of litigation. *Id.* It is obvious that the vast majority of Ms. Baumgartner's affidavit sets forth facts she allegedly observed in her employment at Small Beginnings, and no privilege prevents her from recounting such observations. Paragraphs 1-7, and 9-23 are nothing more than recitations of Ms. Baumgartner's personal observations, and are thus proper. Paragraph 8 includes the fact that Baumgartner had discussions with Cadence executives about the uses of the space in the building. This paragraph includes the substance of only one question - "Where's the other space?" - allegedly asked by "most" of the executives. Cadence has failed to show that any of the foregoing matters are protected by any privilege.

Paragraphs 24-29 of the affidavit describe how Ms. Baumgartner came to draw a map, write a narrative description, and sent an email to Cadence executives showing Cadence's use of the Small Beginnings building. As to these allegations, Cadence has averred that the request for such materials was prompted by Cadence's outside counsel and was for the purpose of preparing for imminent litigation. (Doc. 176 at 7.) To date Cadence has made no such showing.[11] The court will therefore deny the motion to strike these matters, but will do so without prejudice to Cadence reasserting the issue before trial upon a proper showing. For the same reasons, Defendants' motion

---

[11] The court finds no record of having received documents from Cadence for in camera review.

to declare these matters to be non-privileged will be granted at this time. It bears pointing out that even if the court were to strike any reference to the map or the descriptions previously prepared by Ms. Baumgartner for the benefit of Cadence, Ms. Baumgartner would not be precluded from testifying at trial about her personal observations of the uses of the building, nor would she be precluded from creating another map based on her knowledge of events.

Finally, paragraphs 30-34 of Ms. Baumgartner's affidavit are simply irrelevant to the motion for summary judgment. The court will therefore deny the motion to strike these matters as moot.

In sum, Plaintiff's motion to strike (Doc. 176) is denied; Defendants' motion for order regarding privilege (Doc. 175) is granted to the extent indicated above. The court's ruling is without prejudice to the refiling of a motion to strike supported by materials demonstrating the elements of attorney-client or work-product privilege.

### VII. Plaintiff's Motion to Exclude Expert Testimony (Docs. 194, 207, 210.)

Cadence moves to exclude a report and testimony of Aaron Bono, Defendants' computer expert. It argues that Bono's opinions include matters outside his expertise or that are not shown to be the result of any reliable method. (Doc. 194 at 1.) It also moves to exclude certain non-retained expert testimony of Brandon and Sarah Vore, arguing Defendants failed to properly disclose any such testimony. In response, Defendants argue the testimony is proper under Rule 702 and that it will "assist the jury in understanding [the] nature of the computers/servers, electronic data, programs, business records and intellectual property which are the subject matter of the counterclaims, why it cannot be replaced, and the value of that property." (Doc. 207 at 2.)

As an initial matter, the court notes that the grant of summary judgment in favor of Cadence on the counterclaims may limit the relevance of the proposed expert testimony. Because the parties

have not had a chance to address that issue, however, the court will only address the issues presented in the briefs and will resolve any additional questions of relevance in rulings in limine or at trial.

Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Tenth Circuit recently noted:

> In evaluating the admissibility of expert testimony, "the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quotation marks omitted). This requires a two-step process. First, the district court must "determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702). Second, if the expert is sufficiently qualified, the district court "must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* Importantly, the court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." [citation omitted]

*Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282–83 (10th Cir. 2018).

Cadence first seeks to exclude opinion evidence by Aaron Bono pertaining to who owned the server or component parts following the APA, as well as the extent of Cadence's authority to remove or replace CS-DB01. (Doc. 194 at 4.) The court agrees with Cadence that any opinions

by Bono pertaining to who owned or had authority to access or remove various computer parts is not a matter within his expertise or that would be helpful to the jury. This would include opinions about Cadence "commandeer[ing]" accounts, the "very limited license and access Cadence held," that Cadence "was never authorized to remove, alter, modify or destroy CS-DB01," and drives and data "were hijacked" by Cadence. (Doc. 207 at 4.) The court rejects Defendants' argument that such opinions are merely based on Bono's experience or were properly formed from hearsay of a type reasonably relied on by experts in the field. (Doc. 207 at 4.) Bono is a computer expert; he has no demonstrated expertise with respect to property rights. His opinions in that regard will be excluded.

Cadence's second objection concerns Bono's opinion as to the nature of the connection between CD-DB01 and the Infant Manager software. Bono's opinions on this computer-related issue is clearly a matter within his expertise. In light of the court's dismissal of the counterclaims, however, Defendants will have to demonstrate the relevance of the opinion as to the remaining claims in order to use the opinion at trial. For the moment, the motion to exclude the opinion is denied. The same is true with respect to Bono's opinions as to what items were taken from the server room and the value of those items. (Doc. 194 at 4.) Assuming the removal of computer-related items from the server room is relevant to the remaining claims, Bono's expertise in identifying those items and in interpreting the forensic evidence of their removal may assist the jury. Similarly, his knowledge of and research concerning the value of such items properly relies upon his expertise and knowledge of computer devices. Assuming such testimony is relevant, Cadence can test the reliability of it with cross-examination, but its motion fails to show that such opinions must be excluded at this point. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Cadence also seeks to exclude any expert opinions from Brandon and Sarah Vore because, it argues, Defendants did not properly disclose any such testimony. (Doc. 194 at 9.) Defendants respond by arguing that Cadence waived any such objection and, in any event, the subject matter of Defendants' testimony was properly disclosed. (Doc. 207 at 9.) The court is hampered in addressing the issue because neither side has identified any particular disputed opinion. Absent a concrete objection to some specific opinion, the court is unable to determine its admissibility. Accordingly, Plaintiff's motion to exclude expert opinions by Brandon and Sarah Vore will be denied without prejudice.

**VIII. Defendants' Motion to Exclude Non-Retained Expert Testimony (Docs. 196, 208, 211.)**

Defendants seek to exclude opinions from four Cadence corporate officers (President David Goldberg, Vice President Jomar Jenkins, former CEO Doug MacKay, and Vice President Sharon Moran) on the grounds that their opinions are not proper subjects of expert testimony and will not assist the jury. (Doc. 196 at 1.)

Defendants first argue that any opinions by these witnesses about the industry meaning of the terms "occupy" or "expand" are inadmissible because such opinions amount to legal conclusions, they would usurp the function of the jury, and they would interfere with the court's duty to instruct upon the law. (*Id*. at 4.) The court concludes the motion to exclude such opinions should be denied. As noted previously, if the terms of a contract are ambiguous, extrinsic or parol evidence may be considered to construe it. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. The court has already determined that these terms rendered the Sublease ambiguous. In such

circumstances, where a term has a particular meaning in a trade or business that varies from its ordinary meaning, "evidence of the meaning given by usage of the trade or business is admissible." *See Seymour v. Armstrong*, 62 Kan. 720, 64 P. 612, 613 (1901). *See also Central Nat. Res., Inc. v. Davis Operating Co.*, 288 Kan. 234, 246, 201 P.3d 680 (2009) ("[C]ertain terms may have a commonly understood meaning within a trade or industry, so that a commercial contract between parties that are regularly engaged in that trade or industry would be construed in the context of that common usage.") Cadence represents that such opinions will be presented based upon its witnesses' years of experience in the child education business. Such testimony may be helpful to the jury and may be sufficiently reliable for its consideration. At this stage, Defendants have not shown that such opinions should be excluded.

Defendants next challenge any opinion by Cadence witnesses that FHD "owes Cadence… unpaid amounts calculated from March 1, 2016 through the present." (Doc. 196 at 4.) Defendants argue any opinion that FHD "owes" Cadence is an improper comment upon the law. The court will deny the motion to exclude this testimony. Cadence represents that these witnesses will apply the Sublease's rent and rent-reduction formulas to calculate how much rent FHD would owe assuming the jury finds in favor of Cadence. (Doc. 208 at 6-7.) With this understanding, the testimony appears to be essentially a mathematical calculation rather than an improper comment on the law. Such testimony may prove useful to the jury given the number of variables that could affect the calculation of rent. Defendants may of course assert a contemporaneous objection to any improper comment upon the law, but the witnesses are not precluded from calculating the amounts FHD would owe if the jury finds in favor of Cadence.

Defendants also seek to exclude any opinion testimony from these witnesses "about unspecified 'purposes of, motivations for, and implementation of asset purchase or lease

agreements on the part of buyers or lessors in the industry." (Doc. 196 at 5.) Defendants argue such opinions are "totally irrelevant to the Sublease…." (*Id.*). In response, Cadence asserts that such testimony "will provide helpful context for the jury in determining the nature and extent of obligations under the Sublease…." (Doc. 208 at 5.) The court will deny the motion to exclude this testimony at this time. Defendants have identified no specific opinions in dispute, and the court cannot assess the admissibility of an opinion in the abstract. Some testimony about the parties' purposes and discussions leading to the APA will likely be required for the jury to understand the context of the Sublease. Beyond that, general opinions about asset purchase agreements are not likely to have much relevance in the instant case unless they involve matters discussed in negotiations between the parties. The court will address any such opinions when a contemporaneous objection is raised at trial.

### IX. Defendants' Second Motion for Sanctions (Docs. 214, 216, 218.)

Defendants note that Cadence was previously sanctioned by the court for failing to timely disclose its discovery of a second hard drive in CS-DB02, a server Cadence removed from the server room at Canterbury Prep. (Docs. 191, 215.) Defendants now seek additional sanctions based on recently discovered evidence that a third hard drive was within CS-DB02 on June 4, 2017 – months after a demand and preservation letter was sent to Cadence - and was subsequently removed by Cadence. Defendants contend forensic evidence also shows Cadence "browsed and manipulated" the second hard drive, that Ed Shoro's testimony about erasing the single drive in CS-DB02 was knowingly false, and that Cadence "purposefully concealed" the existence of the two additional drives and the information therein. (Doc. 214 at 2, 6.) Although Cadence has proposed a forensic analysis of the third drive, Defendants argue they have been irreparably prejudiced. They contend an appropriate sanction is a default judgment against Cadence on the

conversion counterclaims and an award of damages and costs. Alternatively, Defendants request a spoliation instruction, exclusion of Ed Shoro and Ed Soto's testimony, and an award of expenses. (Doc. 214 at 14.)

Cadence contends it had difficulty identifying server components because the counterclaims were not asserted until months after the equipment was removed, and because it had to rely on Defendants to identify the equipment. It contends it was able to find and identify this third hard drive only after Defendants' expert identified the serial number of the drive. (Doc. 216 at 6-7.) Cadence says that after it learned the serial number, it located the third hard drive in a stack of other hard drives at Ed Soto's home office. (*Id.* at 7.) It says it promptly notified Defendants and offered to pay for a forensic examination. Cadence argues Defendants have not shown that any electronic information had been lost and that Defendants have not been prejudiced. It also argues that it did not intentionally conceal information and that no finding of bad faith is warranted. (Doc. 216 at 10-11.) Cadence argues no sanction is appropriate in view of Defendants' refusal to accept offers to examine the hard drive. Cadence also asserts that it is entitled to fees because Defendants "made no actual effort" to meet and confer prior to filing the motion.

The court has the authority to impose sanctions if electronically stored information (ESI) that should have been preserved is lost because a party failed to take reasonable steps to preserve it. Fed. R. Civ. P. 37(e). At this point, it is premature to conclude that any ESI has been irretrievably been lost. The first logical step is to ascertain what information can be gathered from drives belatedly produced by Cadence. Cadence contends that on December 10, 2018, it offered to: a) image the third drive and generate a file listing; b) pay for Defendants' expert's travel expenses to observe the imaging; c) permit an inspection of the drive by Defendants' expert either in California or Kansas City; and d) produce Ed Soto for a deposition in Kansas City concerning

the newly found drive. (Doc. 216 at 8.)  Based on Cadence's second significant failure to produce ESI, the court could direct Cadence to comply with the foregoing offer, should Defendants elect to pursue it.[12]  The court will address this issues with the parties at the March 11 in limine conference, and will defer a final ruling on the motion for sanctions.

      **IT IS THEREFORE ORDERED** this 25th day of February, 2019, that Defendants' Motion for Summary Judgment (Doc. 154) is GRANTED IN PART and DENIED IN PART; Plaintiff's Motion for Summary Judgment on Liability as to Count One (Doc. 156) is DENIED; Plaintiff's Motion for Summary Judgment on Counterclaims (Doc. 158) is GRANTED; Defendants' Motion for Order Regarding Claim of Privilege (Doc. 175) is GRANTED;  Plaintiff's Motion to Strike (Doc. 176) is DENIED;  Plaintiff's Motion to Exclude Expert Testimony (Doc. 194) is GRANTED IN PART and DENIED IN PART; Defendants' Motion to Exclude Expert Testimony (Doc. 196) is DENIED; and Defendants' Second Motion for Sanctions (Doc. 214) is TAKEN UNDER ADVISEMENT.

      IT IS SO ORDERED.

                        ____s/ John W. Broomes_____
                        JOHN W. BROOMES
                        UNITED STATES DISTRICT JUDGE

---

[12] The court recognizes that the grant of summary judgment on the counterclaims may alter the parties' consideration of this matter.  The court also recognizes that the trial is rapidly approaching.  Cadence offered an examination of the drive nearly two months ago, however, which should have permitted the parties and the court to address the issue in the instant motion with all of the relevant facts.